# United States Court of Appeals for the Federal Circuit

---

**STRATEGIC HOUSING FINANCE CORPORATION OF TRAVIS COUNTY,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2009-5078

---

Appeal from the United States Court of Federal Claims in 06-CV-741, Judge Margaret M. Sweeney.

---

Decided: June 7, 2010

---

WILLIAM MARK SCOTT, Law Office of W. Mark Scott PLLC, of Washington, DC, argued for plaintiff-appellant.

BETHANY B. HAUSER, Trial Attorney, Appellate Section, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were JOHN A. DICICCO, Acting Assistant Attorney General, and RICHARD FARBER, Attorney.

---

Before GAJARSA, LINN, and MOORE, *Circuit Judges.*

GAJARSA, *Circuit Judge.*

The issue before this court is whether a bond issuer must first seek an administrative refund for an arbitrage rebate from the Internal Revenue Service ("IRS") before filing a suit for a refund in the U.S. Court of Federal Claims ("CFC"). Strategic Housing Finance Corp. of Travis County, Texas ("Strategic Housing"), appeals from the CFC's order dismissing Strategic Housing's suit against the United States to recover its arbitrage rebate. In its complaint before the CFC, Strategic Housing alleged, among other things, that the United States required it to remit the arbitrage rebate as an illegal exaction or taking. The CFC dismissed the suit for lack of jurisdiction under I.R.C. § 7422(a).[1] We affirm and hold that § 7422(a) prohibits a court from asserting jurisdiction to hear a bond issuer's claim to recover an arbitrage rebate when the issuer failed to first seek an administrative refund from the IRS. However, we vacate that portion of the CFC's judgment addressing whether I.R.C. § 148(f)(3) grants the Secretary of the Treasury (the "Secretary") unfettered discretion to accelerate an arbitrage rebate.

## BACKGROUND

Because of the complexity of the subject matter in this proceeding, it is helpful for the reader to obtain a general understanding of arbitrage bonds and rebates.

### I.   Arbitrage Bonds & Rebates

In general, Congress exempts the interest a bondholder earns on a state or local government bond from his gross income for tax purposes. *See* I.R.C. § 103(a) (2006).

---

[1]   All citations to the Internal Revenue Code ("I.R.C.") are references to Title 26 of the United States Code.

However, Congress does not grant tax-exempt status to three types of state or local government bonds, including arbitrage bonds as defined in I.R.C. § 148. *See id.* § 103(b)(2). Arbitrage is the practice of "simultaneous[ly] buying and selling . . . identical securities in different markets, with the hope of profiting from the price difference in those markets." *Black's Law Dictionary* 112 (8th ed. 2004). For a bond, "[i]nvestment earnings that exceed the yield on a bond issue are referred to as arbitrage." 1 Jacob Mertens, Jr., *The Law of Federal Income Taxation* § 8:22, at 8-86 (2007). Accordingly, an arbitrage bond is any bond from which the issuer uses part of the proceeds "to acquire higher-yielding investments or to replace funds which were so used." *Id.* For example, a state or local government might issue ten-year bonds with a 3.0% interest rate and invest the proceeds into ten-year federal government bonds with a 3.5% interest rate instead of using the proceeds from the sale of its bonds for the purpose for which the bonds were issued. *See, e.g.*, S. Rep. No. 91-552, at 219 (1969) ("Some State and local governments have misused their tax exemption privilege by engaging in arbitrage transactions in which the funds from the tax-exempt issues are employed to purchase higher yielding Federal or other obligations the interest on which is not taxed in their hands . . . .").

Congress has enacted legislation defining arbitrage bonds and granting the Secretary rulemaking authority to carry out its arbitrage laws. *See* I.R.C. § 148. Congress has defined arbitrage bonds as bonds that the issuer issues "reasonably expect[ing]" to use "any portion of the proceeds . . . directly or indirectly—(1) to acquire higher yielding investments, or (2) to replace funds which were used directly or indirectly to acquire higher yielding

investments." *Id.* § 148(a) (alteration added).[2] Accordingly, a bond's arbitrage status depends on the bond yield. To ensure the enforcement of the arbitrage laws, Congress has authorized the Secretary to "prescribe such regulations as may be necessary or appropriate to carry out the purposes of" its arbitrage laws. *Id.* § 148(i).

Pursuant to this rulemaking authority, the Secretary has defined bond yield for variable interest rate bonds using a formula that depends in part on the fees a bond issuer pays for qualified guarantees. *See* Treas. Reg. § 1.148-4(c)(1) (2009) ("The yield for each computation period is the discount rate that, when used in computing the present value as of the first day of the computation period of all the payments of principal and interest and fees for qualified guarantees that are attributable to the computation period, produces an amount equal to the present value . . . of the bonds . . . .").[3] In general, a guarantee is another firm's promise to make payments for items such as the bond's principal and interest when the bond issuer fails to pay the bondholders. *See id.* § 1.148-4(f)(3). A guarantee is a "qualified guarantee" only if the fees that the bond issuer pays for the guarantee satisfy additional regulations. *See id.* § 1.148-4(f)(1). For example, the "[f]ees for a guarantee must not exceed a reasonable, arm's-length charge for the transfer of credit risk." *Id.* With a few exceptions, *see, e.g.*, I.R.C. § 148(c)(1), state or local government bonds that the Secretary determines meet Congress's definition of arbitrage bonds

---

[2] The term 'higher yielding investments' means any investment property which produces a yield over the term of the issue which is materially higher than the yield on the issue." I.R.C. § 148(b)(1).

[3] All citations to Treasury Regulations ("Treas. Reg.") are references to Title 26 of the Code of Federal Regulations.

based on his yield calculations lose their tax-exempt status such that bondholders must pay taxes on interest earned on the bonds, *id.* § 103(b)(2).

Congress has, however, provided a means for state and local governments to restore tax-exempt status to its bonds after using the proceeds to acquire higher yielding investments. A bond issuer can maintain the tax-exempt status of its bonds by remitting the profits it earned from arbitrage to the United States. *See id.* § 148(f)(2). This sum is known as an arbitrage rebate. To qualify as an arbitrage rebate, the bond issuer must remit 90% of its arbitrage profits at least once every five years. *Id.* § 148(f)(3); Treas. Reg. §§ 1.148-3(e)(1), 1.148-3(f)(1), 1.148-3(g). However, the bond issuer's last installment is due sixty days after the day on which the bond issuer redeems its last bond. I.R.C. § 148(f)(3).

This timetable for remitting arbitrage rebates contains an important exception—the installments are due as prescribed by statute "[e]xcept to the extent provided by the Secretary." *Id.* Pursuant to his rulemaking authority, the Secretary has issued regulations governing arbitrage restrictions on state and local government bonds. *See* Treas. Reg. §§ 1.148-0 to 1.148-11. For example, the Secretary has authorized the Commissioner of Internal Revenue (the "Commissioner") to "take specific actions that ensure that the purposes of section 148 are effectuated." *Strategic Hous. Fin. Corp. of Travis County v. United States*, 86 Fed. Cl. 518, 523 (2009). One of these rules authorizes the Commissioner to accelerate the date on which an arbitrage rebate is due:

> If the Commissioner determines that an issue is likely to fail to meet the requirements of § 1.148-3 and that a failure to serve a notice of demand for payment on the issuer will jeopardize the assess-

ment or collection of tax on interest paid or to be paid on the issue, the date that the Commissioner serves notice on the issuer is treated as a required computation date for payment of rebate for that issue.

Treas. Reg. § 1.148-10(f).

The Secretary has also authorized the Commissioner to allow a state or local government to "recover an over-payment" of an arbitrage rebate when that government "establish[es] to the satisfaction of the Commissioner that the overpayment occurred." *Id.* § 1.148-3(i)(1) (alteration added). Both the regulations covering the accelerating authority and overpayment disputes are at issue in this case as explained below.

## II.  Strategic Housing's Arbitrage Bonds & Rebate

Strategic Housing is a nonprofit corporation organized to provide low-cost residential housing in Travis County, Texas. *Strategic Hous.*, 86 Fed. Cl. at 524. In September 2004, Strategic Housing issued a total of $35 million of "Variable Rate Lease Purchase Revenue Bonds" to finance a lease-to-own program in conjunction with the Federal Home Loan Mortgage Corp., commonly known as Freddie Mac. *Id.* at 524–25. Strategic Housing issued these bonds with a statement that purchasers could exclude the interest earned on the bonds from gross income for federal income tax purposes. *Id.* at 525. Although Strategic Housing's tax counsel advised that it could include this statement on the bonds, Strategic Housing did not obtain an advance IRS ruling that the bonds qualified as tax-exempt. *Id.*

After Strategic Housing began issuing the bonds, the IRS performed an audit. *Id.* Based on that audit, the IRS Office of Tax Exempt Bonds, Compliance and Program

Management ("TEB") "develop[ed] concerns about various arbitrage issues impacting the bonds." J.A. 60 (alteration added). In a letter dated May 31, 2006, a TEB examiner explained that Strategic Housing was paying a "Forward Purchaser Fee" to Société Générale for not only a "transfer of credit risk," but also so that Société Générale would "assume[] liability for any principal shortfall, at the bonds' maturity." *Id.* (alteration added). In other words, the "[f]ees for [the] guarantee . . . exceed[ed] a reasonable, arm's-length charge for the transfer of credit risk," Treas. Reg. § 1.148-4(f)(4)(i) (alterations added), because the fees paid for "services other than the transfer of credit risk," *id.* § 1.148-4(f)(4)(ii). The examiner explained that with this shortfall included as part of the service fee, the fee could not be a "qualified guarantee" under Treasury Regulation § 1.148-4(f). J.A. 60. Without the qualified guarantee, the Treasury Regulations required TEB to calculate a higher bond yield, thus increasing the arbitrage and jeopardizing the bonds' tax-exempt status. The examiner also listed several other arbitrage concerns and requested more information "in determining whether to issue a preliminary adverse determination." J.A. 61.

Instead of issuing a preliminary adverse determination, the IRS notified Strategic Housing on June 26, 2006, that the agency was accelerating the due date of a full arbitrage rebate pursuant to Treasury Regulation § 1.148-10(f)—the accelerating authority. *See Strategic Hous.*, 86 Fed. Cl. at 525. In the notice, TEB informed Strategic Housing that because it determined that the Société Générale service fee was not a "qualified guarantee," it would adjust its calculation of the bond yield to exclude the fee. J.A. 62–63. Reducing the bond yield created an arbitrage bond and "result[ed] in rebate due." J.A. 63 (alteration added). Moreover, TEB determined that without the demand of an accelerated payment, the

rebate due on the bonds would be jeopardized. Accordingly, TEB required Strategic Housing to remit a rebate within sixty days of the June 26, 2006, rebate computation date, requiring the payment to be due on August 25, 2006. *See Strategic Hous.*, 86 Fed. Cl. at 525.

The jeopardy notice did not state an amount for the arbitrage rebate, and Strategic Housing hired an expert who calculated the rebate to be $267,444.00. *Id.* After obtaining a time extension, Strategic Housing remitted $267,444.00 to the United States on September 21, 2006, but "indicated on its enclosed IRS Form 8038-T that its 'remittance was specifically made under protest with all rights reserved.'" *Id.*

## III. CFC Proceedings

On October 31, 2006, Strategic Housing filed suit against the United States in the CFC to recover its arbitrage rebate of $267,444.00. According to its first amended complaint, Strategic Housing alleged that the IRS "committed an illegal exaction and illegal taking without due process when it forced [Strategic Housing] to make an early remittance of a disputed amount under threat," J.A. 77 (alteration added), and that the IRS committed a separate illegal taking by refusing to pay interest on any refund of the rebate, J.A. 78. Strategic Housing further alleged that the IRS did not provide it with "a reasonable, timely opportunity to refute the IRS determinations [in the jeopardy notice] and, therefore, has no means to receive a timely refund pursuant to existing IRS administrative procedures." J.A. 78 (alteration added). Finally, Strategic Housing claimed that its arbitrage rebate was "an immediately refundable deposit." J.A. 87. Strategic Housing filed its complaint with the CFC "without first filing a refund claim with the IRS" as

required by Treasury Regulation § 1.148-3(i)(1).  *Strategic Hous.*, 86 Fed. Cl. at 526.

On June 6, 2007, the United States filed a Rule 12(b)(6) motion to dismiss Strategic Housing's suit for failure to exhaust administrative remedies.  *Id.* at 527. Subsequently, on October 26, 2007, the United States filed a Rule 12(b)(1) motion to dismiss for lack of jurisdiction based on I.R.C. § 7422(a), arguing that this statute required Strategic Housing to file an administrative claim for refund with the IRS before the CFC could assert jurisdiction.  *See id.* at 528.  Section 7422(a) states in its entirety as follows:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

In its opposition to the Rule 12(b)(1) motion, Strategic Housing asserted for the first time that it had filed an administrative claim on Form 8038-R ("Request for Recovery of Overpayments Under Arbitrage Rebate Provisions") on September 28, 2007, "to start the 6-month period under [26 U.S.C.] § 6532."  *Strategic Hous.*, 86 Fed. Cl. at 526 n.18 (internal quotation marks omitted) (alteration in original).  Strategic Housing further claimed to have "resubmitted" Form 8038-R to the IRS on December 12, 2007.  *Id.*

The CFC granted the United States' Rule 12(b)(1) motion, holding that it lacked jurisdiction. *Id.* at 546. Based on the U.S. Supreme Court's decision in *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1 (2008), the CFC held that I.R.C. § 7422(a) requires state or local governments that seek a refund of its arbitrage rebate "to [first] seek an administrative refund prior to initiating suit in the Court of Federal Claims." *Strategic Hous.*, 86 Fed. Cl. at 526 (alteration added). Strategic Housing now appeals that decision.

This court has jurisdiction over Strategic Housing's timely filed appeal pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

On appeal, Strategic Housing argues that the CFC improperly dismissed its suit to recover an arbitrage rebate for lack of jurisdiction under I.R.C. § 7422(a). According to Strategic Housing, it was not required to file an administrative refund claim with the IRS before filing a civil action to recover an arbitrage rebate in the CFC.

This court reviews the CFC's decisions regarding its jurisdiction without deference as a matter of law. *Keener v. United States*, 551 F.3d 1358, 1361 (Fed. Cir. 2009). As the plaintiff, Strategic Housing bears the burden of establishing the CFC's jurisdiction. *Id.*

### I.   The Plain Language of I.R.C. § 7422(a)

When interpreting any statute, we look first to the statutory language. *Jimenez v. Quarterman*, 129 S. Ct. 681, 685 (2009); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). The best evidence of congressional intent is the plain meaning of the statutory language at the time Congress enacted the statute. *See, e.g., Ngiraingas v. Sanchez*, 495 U.S. 182, 187 (1990) ("We seek . . . indicia of congressional intent at the time the statute was en-

acted."); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). "[W]hen the statutory language is plain, we must enforce it according to its terms." *Jimenez*, 129 S. Ct. at 685; *see also Lamie*, 540 U.S. at 534; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

This case requires us to interpret statutes governing the CFC's jurisdiction over a claim against the United States to recover an arbitrage rebate. Under the Tucker Act, the United States has waived its sovereign immunity to suit when a plaintiff seeks to recover money that it paid to the United States in full or in part. *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). Specifically, Congress waived the government's immunity to a party's suit to recover sums that the United States illegally exacted under the Internal Revenue Code. A party who seeks to recover "[1] any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or [2] any penalty claimed to have been collected without authority or [3] any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws" may file a "civil action against the United States" in federal district court or in the CFC. 28 U.S.C. § 1346(a)(1) (alterations added).

However, a federal court's jurisdiction over illegal exaction claims is subject to the administrative refund scheme that Congress established in the Internal Revenue Code. *See Clintwood Elkhorn*, 553 U.S. at 4 ("The Internal Revenue Code specifies that before [bringing an action for a tax refund], the taxpayer must comply with the tax refund scheme established in the Code."); *United*

*States v. Dalm*, 494 U.S. 596, 609–10 (1990) (interpreting I.R.C. §§ 6511(a), 7422(a) to require a taxpayer seeking a refund of a gift tax to file a refund claim with the IRS before filing an action in federal court). Section 7422(a) of the code states that "[n]o suit . . . shall be maintained in any court for the recovery of [1] any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or [2] of any penalty claimed to have been collected without authority, or [3] of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund . . . has been duly filed with" the IRS. (Alterations added.) In other words, a party seeking to recover any internal-revenue tax, penalty, or sum from the United States must pursue and exhaust its administrative remedies pursuant to the IRS's regulations prior to filing a complaint in federal court.

In this case, the plain language of § 7422(a) bars the CFC from asserting jurisdiction over Strategic Housing's claim for a refund of its arbitrage rebate. A claim to recover an arbitrage rebate clearly falls into either the statute's first category as a claim to recover an allegedly erroneous or illegal tax or into the third category as a claim to recover an allegedly excessive or wrongfully collected sum. Neither party argues that a claim to recover an arbitrage rebate would qualify as a claim to recover a penalty because a "'a penalty . . . is an exaction imposed by statute as punishment for an unlawful act.'" *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)); *see also* I.R.C. § 148(f)(4)(C)(vii) (providing bond issuers the option to pay a penalty in lieu of an arbitrage rebate). Because the statute clearly covers a claim to recover an arbitrage rebate regardless of whether the rebate is defined as a tax or non-tax, we decline Strategic Housing's invitation to

determine whether an arbitrage rebate is a tax in the first instance.

If an arbitrage rebate is a tax, a claim to recover an arbitrage rebate would be a claim to recover an "internal revenue tax alleged to have been erroneously or illegally assessed or collected."  I.R.C. § 7422(a).  This first category in the claim-for-refund statute has remained virtually unchanged since Congress enacted it in 1866.  *See* Act of July 13, 1866, ch. 184, § 19, 14 Stat. 98, 152 ("[N]o suit shall be maintained in any court for the recovery of any tax alleged to have been erroneously or illegally assessed or collected, until appeal shall have been duly made to the commissioner of internal revenue . . . .") (codified as amended at Revised Statutes § 3226 (1878)).  Likewise, the meanings of the terms "assess" and "collect" have not substantially changed since 1866.  As in the 1860s, the term "assess" still means "[t]o set, fix, or charge a certain sum upon, as a tax."  Noah Webster et al., *An American Dictionary of the English Language* 1324 (Springfield, Mass., G. & C. Merriam 1865); *see also* 1 *The Oxford English Dictionary* 709 (2d ed. 1989) (defining "assess" as "[t]o settle, determine, or fix the amount of (taxation, fine, etc.) to be paid by a person or community"); *Webster's New International Dictionary of the English Language* 139 (1925) (defining "assess" as "[t]o fix or determine the rate or amount of" or "[t]o apportion (a sum to be paid by a person, a community, or an estate), in the nature of a tax, fine, etc.").  Moreover, in 1866, the term "collect" meant "[t]o gather into one body or place," and "collector" meant "[a]n officer appointed and commissioned to collect and receive customs, duties, taxes, or toll."  Noah Webster et al., *An American Dictionary of the English Language* 251 (Springfield, Mass., G. & C. Merriam 1865).  When Congress later reenacted and amended Revised Statutes § 3226, *see, e.g.*, Revenue Act of 1926, ch. 27, § 1113(a), 44

Stat. 9, 116, "collect" was more clearly defined in this context as "[t]o demand and obtain payment of, as an account, or other indebtedness; as, to *collect* taxes." *Webster's New International Dictionary of the English Language* 437 (1925); *see also* 3 *The Oxford English Dictionary* 709 (2d ed. 1989) (defining "collect" as "[t]o gather (contributions of money, or money due, as taxes, etc.) from a number of people").

Again if an arbitrage rebate is a tax, the plain meanings of "assess" and "collect" show that Strategic Housing made a claim to recover an "internal revenue tax [that it] alleged to have been erroneously or illegally assessed or collected." I.R.C. § 7422(a) (alteration added). The IRS "collected" Strategic Housing's rebate when Strategic Housing "paid to the United States," *id.* § 148(f)(2), its arbitrage rebate and the IRS deposited the rebate into accounts holding the general federal revenues, Appellant's Br. 20. Based on its first amended complaint, Strategic Housing in effect alleged that the IRS "wrongfully collected" its arbitrage rebate because, among other things, the agency allegedly did so in violation of the Due Process Clause. To be sure, the IRS never assessed the arbitrage rebate by determining how much Strategic Housing would need to pay to retain its bonds' tax-exempt status. But the statutory language covers claims to recover a tax that the United States either "assessed *or* collected." I.R.C. § 7422(a) (emphasis added). Accordingly, § 7422(a) bars the CFC from asserting jurisdiction over a bond issuer's refund claim for an arbitrage rebate when one assumes that an arbitrage rebate is a tax and when the issuer has not first sought an administrative refund from the IRS.

Even if a claim to recover an arbitrage rebate is not a claim to recover a tax, the claim would fall squarely within the third category of § 7422(a). A word-by-word analysis demonstrates that a claim to recover an arbi-

trage rebate would be a claim to recover "any sum alleged to have been excessive or in any manner wrongfully collected." I.R.C. § 7422(a).

First, if an arbitrage rebate is not a tax, then it would unquestionably be a sum as used in § 7422(a). In *Flora v. United States* ("*Flora II*"), 362 U.S. 145 (1960), the Supreme Court interpreted "any sum" in 28 U.S.C. § 1346(a)(1) to cover any "amounts which are neither taxes nor penalties" that a party seeks to recover from the United States. *Id.* at 149. The Court's definition of "any sum" also applies to § 7422(a). As the Court explained, Congress "copied" the language in 28 U.S.C. § 1346(a)(1) from Revised Statutes § 3226—the precursor statute to I.R.C. § 7422(a). *Flora v. United States* ("*Flora I*"), 357 U.S. 63, 65 (1958); *see also Flora II*, 362 U.S. at 152. Consequently, "the function of the phrase ['any sum' in 28 U.S.C. § 1346(a)(1)] is to permit suit for recovery of items which might not be designed as either 'taxes' or 'penalties' by Congress or the courts." *Flora II*, 362 U.S. at 149 (alteration added). In contrast, "the function of the phrase ['any sum' in § 7422(a)] is to [bar] suit for recovery of items which might not be designed as either 'taxes' or 'penalties' by Congress or the courts," if the party has not first filed the claim with the IRS. *Id.* (alterations added).

The Court's interpretation comports with how the term "sum" has been defined since Congress first included the phrase "any sum which it is alleged was excessive, or in any manner wrongfully collected" in 1872 into the claim-for-refund statute. Act of June 6, 1872, ch. 315, § 44, 17 Stat. 230, 257 (codified as amended at Revised Statutes § 3226 (1878)). The term "sum" has long meant "[a] quantity of money or currency" or "any amount, indefinitely." Noah Webster et al., *An American Dictionary of the English Language* 1324 (Springfield, Mass., G. & C. Merriam 1865); *see also* 17 *The Oxford English*

*Dictionary* 166 (2d ed. 1989) (defining "sum" as "[a] quantity or amount of money"); *Webster's New International Dictionary of the English Language* 2078 (1925) (defining sum as "[a] quantity of money or currency" or "any amount, indefinitely"). Moreover, it makes no difference that the sum came from an arbitrage rebate because "any" means *any*. As the Court recently explained, "Five 'any's' in one sentence and it begins to seem that Congress meant [I.R.C. § 7422(a)] to have expansive reach." *Clintwood Elkhorn*, 553 U.S. at 7 (alteration added).

Second, Strategic Housing alleged that this sum was collected in "excess." In its first amended complaint, Strategic Housing asserted that the IRS's exclusion of the Société Générale service fee was error and that the correct calculation with the fee yielded a negative arbitrage of $229,060.43. *Strategic Hous.*, 86 Fed. Cl. at 525–26. Accordingly, Strategic Housing alleged that the arbitrage rebate was in excess of $496,504.43.

Third, Strategic Housing alleged that the IRS "wrongfully collected" the arbitrage rebate. As noted above, collect means "[t]o gather (contributions of money, or money due, as taxes, etc.) from a number of people." 3 *The Oxford English Dictionary* 709 (2d ed. 1989). The IRS "collected" Strategic Housing's arbitrage rebate because it informed Strategic Housing that "the *required* rebate payment must be *paid* no later than 60 days after the computation date" and it accepted Strategic Housing's payment by depositing the sum into accounts holding general revenues. J.A. 62 (emphasis added).

A recent Supreme Court decision reinforces this conclusion. In *Clintwood Elkhorn*, the Court held that § 7422(a) barred coal companies from filing suit against the United States in the CFC for a refund of taxes that the United States levied on shipments of coal exports in

violation of the Export Clause.  553 U.S. at 4.  The Court explained that the CFC lacked jurisdiction because the coal companies failed to first seek an administrative refund from the IRS as required by § 7422(a).  *Id.*  Recognizing that the statute of limitations in the Internal Revenue Code had run, the coal companies filed suit in the CFC, asserting that the Tucker Act's more generous statute of limitations applied to their refund suit.  *Id.* at 6.  Under the Internal Revenue Code's statute of limitations, a taxpayer seeking a tax refund must file a claim within three years of filing a return or within two years of paying the tax, whichever is later.  *See* I.R.C. § 6511(a).  In contrast, the Tucker Act required a party to file a claim in the CFC "within six years after such claim first accrues."  28 U.S.C. § 2501.  The Court held that the plain meaning of I.R.C. § 7422(a) demonstrated that Congress required a party seeking a tax refund for *any reason* to follow the same procedure—filing a refund claim first with the IRS.  *Clintwood Elkhorn*, 553 U.S. at 4, 7–9.

The same is true of arbitrage rebates.  The Court's expansive reading of § 7422(a) suggests that a claim for a refund of an arbitrage rebate is either a claim to recover an allegedly erroneous or illegal tax or a claim to recover an allegedly excessive or wrongfully collected sum.  Such an expansive reading comports with Congress's purpose in enacting § 7422(a).  As the Court noted, Congress designed its refund scheme "'to advise the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly administration of the revenue,' to provide that refund claims are made promptly, and to allow the IRS to avoid unnecessary litigation by correcting conceded errors."  *Clintwood Elkhorn*, 553 U.S. at 11–12 (quoting *United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 272 (1931)).  As in *Clintwood Elkhorn*, conferring jurisdiction on the CFC over Strategic Housing's suit

here would run counter to the refund scheme because jurisdiction would deprive the IRS of an opportunity to evaluate Strategic Housing's claim to recover its arbitrage rebate in the first instance.

## II. Strategic Housing's Arguments

Strategic Housing raises several arguments on appeal, asserting that a plaintiff may file suit in the CFC to seek a refund of its arbitrage rebate without first seeking administrative relief from the IRS. As a threshold issue, Strategic Housing argues that this court must define an arbitrage rebate as either a tax or non-tax amount. If an arbitrage rebate is a tax, then Strategic Housing argues that I.R.C. § 7422(a) does not apply because Strategic Housing made a deposit on its rebate under protest, not a payment. Alternatively, Strategic Housing argues that if an arbitrage rebate is not a tax, then we should interpret § 7422(a) to bar only claims to recover a tax because the related statutes I.R.C. §§ 6511(a) and 6532(a) impose timing limitations on claims to recover taxes only, not other sums. We address these arguments in turn.

First, Strategic Housing argues that we must decide as a matter of first impression whether an arbitrage rebate is a tax or non-tax amount. Although federal district courts have addressed this issue in passing, no federal court has determined whether an arbitrage rebate is a tax or non-tax amount. *See Gov't Fin. Officers Ass'n v. United States*, 680 F. Supp. 1538, 1534 (N.D. Ga.) ("[T]he Arbitrage Tax is a direct tax on state and local governments."), *vacated by* 686 F. Supp. 901 (N.D. Ga. 1988); *City of Galt v. United States*, 804 F. Supp. 1275, 1278 (E.D. Cal. 1992) (stating in dicta that an "arbitrage payment is not itself a tax"). As Strategic Housing correctly notes, the Supreme Court has generally defined "'a tax [as] a pecuniary burden laid upon individuals or

property for the purpose of supporting the government.'" *Reorganized CF & I Fabricators*, 518 U.S. at 224 (alteration added) (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906)). An arbitrage rebate could be a tax on the basis that Congress requires tax-exempt bond issuers to remit the profits that the issuer earned from arbitrage to the United States, I.R.C. § 148(f)(2), by making payments to the U.S. Treasury as designated by the Commissioner, *id.* § 7809(a); Treas. Reg. § 1.148-3(g). According to Strategic Housing, bond issuers make arbitrage rebate payments into accounts that are part of the general federal revenues and thus available for public use.

However, we need not resolve whether an arbitrage rebate is a tax. As we explained above, I.R.C. § 7422(a) clearly covers a claim to recover an arbitrage rebate regardless of whether the rebate is defined as a tax or non-tax amount. For the purposes of this appeal, we merely recognize that an arbitrage rebate *might* be considered a tax within the meaning of § 7422(a), but expressly reserve that question for another day.

Second, Strategic Housing argues that § 7422(a) does not apply if we consider an arbitrage rebate a tax because Strategic Housing made a *deposit*, not a tax payment. According to Strategic Housing, if an arbitrage rebate is a deposit instead of a tax payment, then the Supreme Court has held that the procedural prerequisites to filing a suit in the CFC, such as a statute of limitations or § 7422(a), do not apply. *See Rosenman v. United States*, 323 U.S. 658, 662–63 (1945). Consequently, Strategic Housing argues that § 7422(a) does not apply to its arbitrage rebate because it remitted the amount as a deposit under protest, not a payment.

This court has indeed held that § 7422(a) does not apply to a deposit for a tax because a deposit is not a suit for

"recovery of any internal revenue tax." *N.Y. Life Ins. Co. v. United States*, 118 F.3d 1553, 1558 (Fed. Cir. 1997). In *New York Life Insurance Co.*, this court explained that because the insurance company made the deposit "to cover 'a payment . . . of taxes expected to accrue *in the future*,' upon assessment," it could not be "a payment of taxes 'erroneously or illegally assessed, or collected.'" *Id.* (emphasis added) (quoting § 7422(a)). In short, we held that § 7422(a) does not bar a claim for a refund of a tax deposit.

But Strategic Housing misunderstands the nature of a deposit. An arbitrage rebate is simply not a deposit. According to the Supreme Court, deposits are placed into a separate account like "payments in escrow. They are set aside . . . in special suspense accounts established for depositing money received when no assessment is then outstanding against the taxpayer." *Rosenman*, 323 U.S. at 662. A taxpayer makes a deposit on a future tax to "stop[] the running of penalties and interest." *Id.* (alteration added). In contrast, a state or local government does not deposit an arbitrage rebate into a separate account in anticipation of paying the full rebate when it becomes due. Instead, an arbitrage rebate is actually "*paid* to the United States" as required by the statutory timetable every five years or as made due by the Secretary. I.R.C. § 148(f)(3) (emphasis added). Even Strategic Housing concedes that arbitrage rebates are "not segregated into a special fund but deposited into the main coffers of the Federal government." Appellant's Br. 20.

Moreover, a deposit on an arbitrage rebate would be pointless. The only way for a state or local government to preserve the tax-exempt status of its bonds is to *pay* the rebate, *id.* § 148(f)(3), not place a deposit in an account should the IRS later determine the bonds are arbitrage bonds. In this case, Strategic Housing did exactly what

the statute requires—it *paid* the arbitrage rebate to the United States.

Third, Strategic Housing argues that if an arbitrage rebate is not a tax, then we should interpret I.R.C. § 6532(a) as limiting the claims covered under § 7422(a) so as to cover only taxpayers or claims to recover a tax. According to Strategic Housing, § 6532(a) only applies to taxpayers, not non-taxpayers, because the statute says that the Secretary will mail a "notice of disallowance" "to the *taxpayer*." (Emphasis added.)   Under § 6532(a)(1), a party filing a suit to recover "any internal revenue tax, penalty, or other sum," pursuant to § 7422(a), cannot do so "before the expiration of 6 months from the date of filing the claim" with the IRS or "after the expiration of 2 years from the date of mailing . . . to the *taxpayer* of a notice of the disallowance." (Emphasis added.)   If an arbitrage rebate is not a tax, Strategic Housing argues, then § 6532(a)'s timing requirements and § 7422(a)'s jurisdictional bar do not apply to bond issuers seeking to recover an arbitrage rebate.

Strategic Housing has the proverbial tail wagging the dog.  The language in § 7422(a) defines the types of claims barred for failure to exhaust one's administrative remedies, not the timing limitations in § 6532(a).   Section 6532(a) means what it says: the statute clearly applies to claims to recover any "tax, penalty, or other sum" when read together with § 7422(a).    The first sentence in § 6532(a) explicitly refers to the three types of claims covered in § 7422(a).  "No suit or proceeding under *section 7422(a)* for the recovery of *any internal revenue tax, penalty, or other sum*, shall be begun before . . . 6 months from the date of filing the claim . . . ."  I.R.C. § 6532(a)(1) (emphasis added).  We recognize that the term "taxpayer" ordinarily means one who pays a tax, not one who pays some other sum.  But we do not read the term "taxpayer"

as somehow redefining the three categories in § 7422(a). As explained above, the terms "tax," "penalty," and "sum" refer to three distinct claims.  The Supreme Court has decided the issue, explaining that the phrase using the term "any sum" covers any "amounts which are neither taxes nor penalties" that a party seeks to recover from the United States.  *Flora II*, 362 U.S. at 149; *cf. Clintwood Elkhorn*, 553 U.S. at 7 ("Five 'any's' in one sentence and it begins to seem that Congress meant [I.R.C. § 7422(a)] to have expansive reach." (alteration added)).  Thus, the timing limitations in § 6532(a) apply to a claim to recover not only any internal revenue tax, but claims to recover any non-tax amounts such as penalties or other sums.

In support of its construction of §§ 7422(a) and 6532(a), Strategic Housing invokes two canons of statutory construction: the *in pari materia* canon and the absurdity canon.  But these canons do not support Strategic Housing's argument.  As Strategic Housing notes, interpreting "any sum" in § 7422(a) differently from "other sum" in § 6532(a) would violate the *in pari materia* canon.  Under this canon, courts should interpret statutes with similar language that generally address the same subject matter together, "'as if they were one law.'" *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (quoting *United States v. Freeman*, 42 U.S. (3 How.) 556, 564 (1845)).  While we certainly agree with Strategic Housing that we must interpret §§ 7422(a) and 6532(a) *in pari materia*, we disagree on how it applies in this case. Both of these sections apply to parties seeking to recover tax and non-tax amounts as long as the party's claim falls within the three categories of § 7422(a).

Section 7422(a)'s legislative history demonstrates that the *in pari materia* canon is particularly applicable here and that §§ 7422(a) and 6532(a) apply to the same types of claims.  Although Congress has relocated the claim-for-

refund statute several times over the past century and a half, the jurisdictional bar now found in § 7422(a) and the timing limitations now found in § 6532(a) were part of the same section until 1954. *See, e.g.*, 26 U.S.C. § 3772(a)(1)–(2) (1952); 26 U.S.C. § 1672(a)(1)–(2) (1934); 26 U.S.C. § 156 (1926); Revised Statutes § 3226 (1878). When Congress reorganized the Internal Revenue Code in 1954, however, it separated the jurisdictional bar and timing limitations into completely separate sections. *See* Internal Revenue Code of 1954, ch. 736, §§ 7422(a), 6532(a), 68A Stat. 3, 816, 876. Congress reorganized the code in large part "to place [provisions] in [a] more logical sequence, [to] delet[e] . . . obsolete material, and . . . to express the internal-revenue laws in a more understandable manner." H. Rep. No. 83-1337, pt. 1, at 1 (1954) (alterations added). Although Congress made substantive changes to some of the internal revenue provisions, it made no substantive changes to the jurisdictional bar or timing limitations now found in §§ 7422(a) and 6532(a), respectively. *See* H. Rep. No. 83-1337, pt. 34, at 99–109 (1954); S. Rep. No. 83-1622, pt. 36, at 133–49 (1954); *see generally* H. Rep. No. 83-2543 (1954) (Conf. Rep.). Aside from changing references from "the Commissioner" to "the Secretary or his delegate," Congress changed the first sentence of the timing limitation from "[n]o such suit or proceeding," 26 U.S.C. § 3772(a)(2) (1952), to "[n]o suit or proceeding under section 7422 (a) for the recovery of any internal revenue tax, penalty, or other sum," Internal Revenue Code of 1954, ch. 736, § 6532(a), 68A Stat. 3, 816. Because we must interpret those sections together and the plain meaning of § 7422(a) covers suits to recover both taxes and non-tax amounts, the timing limitations in § 6532(a) apply to parties seeking to recover non-tax amounts. Contrary to Strategic Housing's argument, § 6532(a) does not define the types of suits covered in § 7422(a). *Cf. United States v. Williams*, 514 U.S. 527,

534 (1995) ("[I.R.C. § 6511(a)'s] plain terms provide only a deadline for filing for administrative relief, not a limit on who may file [under § 7422(a)]." (alterations added)).  It is the other way around.

The other canon on which Strategic Housing relies also does not help its cause.  Strategic Housing argues that interpreting § 7422(a) to cover non-tax amounts would be absurd.  According to Strategic Housing, if we interpreted § 7422(a) to bar suits to recover any tax, penalty, or other sum, but § 6532(a) to place timing limits on only suits to recover a tax, then a party seeking to recover a penalty or other sum could simply file its refund claim with the IRS and then file the same claim seconds later in federal court.  We agree that such a construction of §§ 7422(a) and 6532(a) would be absurd.  *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989) (interpreting a statute so as to avoid an "odd result"); *id.* at 527 (Scalia, J., concurring) ("We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result.").  However, the logical incompatibility of these sections does not mean that we can ignore the plain language of the statute.  The correct solution is to simply apply the plain language of § 7422(a).

Fourth, Strategic Housing argues that if an arbitrage rebate is not a tax, then we cannot interpret § 7422(a) to apply to a claim to recover an arbitrage rebate because the statute of limitations in § 6511(a) only applies to claims to recover a tax, not other sums.  In support of its argument, Strategic Housing relies on *Clintwood Elkhorn* and *Radioshack Corp. v. United States*, 566 F.3d 1358 (Fed. Cir. 2009), to claim that § 6511(a) limits the types of claims to which § 7422(a) applies.

Strategic Housing misunderstands the limits of § 6511(a). That statute requires that a "[c]laim for credit or refund of an overpayment of *any tax* imposed by this title . . . shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid," whichever is later. I.R.C. § 6511(a) (emphasis added). On its face, § 6511(a) only applies to claims to recover a tax, not claims to recover a penalty or other sum. The plain language of § 7422(a) is broader than § 6511(a) as it covers three categories of claims, not one. To be sure, both the Supreme Court and this court have explained that "§§ 6511 and 7422 should be read together to bar a suit for refund in any court." *Radioshack*, 566 F.3d at 1362; *see also Clintwood Elkhorn*, 553 U.S. at 5 ("'Read together, the import of these sections is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund . . . may not be maintained in any court.'" (quoting *Dalm*, 494 U.S. at 602)). But neither court has held that we must superimpose the limits of § 6511(a) onto § 7422(a). Rather, we have interpreted §§ 7422(a) and 6511(a) together when the case involved a claim to recover a tax. *See Clintwood Elkhorn*, 553 U.S. at 4 (addressing how § 7422(a) applied to a claim to recover "taxes collected in violation of the Export Clause"); *Radioshack*, 566 F.3d at 1359 (addressing how § 7422(a) applied to a claim to recover payments under "the Federal Communications Excise Tax"). Therefore, all of Strategic Housing's arguments fail to support its position.

## III. The CFC's Administrative Procedure Act Analysis

Finally, we must address the CFC's opinion on whether a federal court could review the Secretary's decision to accelerate an arbitrage rebate under I.R.C. § 148(f)(3). The U.S. Constitution limits a federal court's jurisdiction "to all Cases, in Law and Equity, arising

under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2, cl. 1. If the Constitution, statute, or treaty does not confer jurisdiction on a federal court, it has no power to resolve the merits of the controversy before it. Consequently, a federal court should not render an opinion on the merits when it determines that it lacks jurisdiction over the matter: "Federal courts are not in the business of rendering advisory opinions." *C&H Nationwide, Inc. v. Norwest Bank Tex. NA*, 208 F.3d 490, 493 (5th Cir. 2000); *see also Alabama v. Shelton*, 535 U.S. 654, 676 (2002) (Scalia, J., dissenting) ("[T]he Court has no business offering an advisory opinion . . . .").

In this case, the CFC rendered an advisory opinion on whether § 148(f)(3) grants the Secretary unfettered discretion to accelerate an arbitrage rebate and thus makes the Secretary's accelerating decision unreviewable under the Administrative Procedure Act ("APA"). *See Strategic Hous.*, 86 Fed. Cl. at 552–53. Before addressing the merits, the CFC noted that "it is well-settled that the Court of Federal Claims lacks jurisdiction to review an agency's decision under the APA." *Id.* at 552. It further noted, "[B]ecause the court cannot entertain actions based upon the APA, plaintiff cannot seek judicial review of the IRS's action on that basis." *Id.* Notwithstanding its lack of jurisdiction, the court continued: "Even if plaintiff could invoke the APA, it does not apply where 'agency action is committed to agency discretion by law.'" *Id.* (quoting 5 U.S.C. § 701(a)(2)). The court then conducted an APA analysis. *See id.* at 552–53. The CFC should not have conducted an APA analysis after recognizing that it lacked jurisdiction. Consequently, we vacate that portion of the CFC's judgment addressing whether § 148(f)(3)

grants the Secretary unfettered discretion to accelerate an arbitrage rebate.

CONCLUSION

For the foregoing reasons, we affirm and hold that I.R.C. § 7422(a) prohibits a court from asserting jurisdiction to hear a bond issuer's claim to recover an arbitrage rebate when the issuer failed to first seek an administrative refund from the IRS. However, we vacate that portion of the CFC's judgment addressing whether I.R.C. § 148(f)(3) grants the Secretary unfettered discretion to accelerate an arbitrage rebate.

**AFFIRMED IN PART and VACATED IN PART**

COSTS

Each party shall bear its own costs.